Mr. Gasket Co., Appellee, *v.* Travis et al., Appellant.

[Cite as Mr. Gasket Co. v. Travis
(1973), 35 Ohio App. 2d 65.]

(No. 31824—Decided August 2, 1973.)

*Mr. Gerald N. Boston* and *Mr. Don Pace,* for appellee.
*Mr. Lance B. Johnson,* for appellants.

DAY, J. This appeal is directed only at errors claimed to affect the corporate defendant, Speed Industries, Inc., except for Assignments of Error Nos. 7 and 8. Those two assignments challenge the award of attorney's fees, litigation expenses, and costs which was made jointly and severally against defendants Speed Industries, Inc., Gilbert Edward Travis, and Charles Klick (see paragraph 2, Journal Entry of February 10, 1972, by the trial court) and a claim that an element of proof necessary for the award of attorney's fees, properly the plaintiff's burden, was placed on the defendants.

Plaintiff-appellee and defendants-appellant, Speed Industries, Inc., will be referred to hereafter as "Gasket", or "Speed", or as the "plaintiff", and the "corporate defendant", respectively.

## I.

After extensive findings of fact and conclusions of law the trial court declared the defendants to be in violation of

R. C. 4165.02(B) and (C),[1] and issued an injunction broadly limiting the defendants in the use[2] of any trade-mark, symbol, or logo which is confusingly "similar to, a simulation of, or in any manner" imitating the plaintiff's logo in existence at the time the suit began.

A similar limitation was placed on the defendants' use of the "products or parts, identification numbers or parts descriptions which are substantially similar, identical to, or which in major part contain a sequence of product numbers or part descriptions similar, or identical to, the product numbers, part descriptions or sequence" used by the plaintiff as they appeared in its catalogs in existence at the time the suit was initiated. Dissimilarity is not achieved, under the order, by using an alphabetical prefix or suffix.[3]

Also enjoined was the use by Defendant Speed on packaging materials of certain specified primary colors used by the plaintiff at the time of suit in packaging produts comparable to those sold by Speed. Particular restrictions were imposed on the use of the color blue on the front or back of any Speed product or price catalog.

In addition, the defendants were prohibited from doings acts in the course of their business which would deceive

---

[1]"Sec. 4165.02 [Acts constituting violation.]

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"* * *

"(B) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

"(C) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; . . ."

[2]The remedy section of Deceptive Trade Practices statute is R. C. 4165.03. The breadth of limitation throughout the order of the trial court, with minor variations, precluded use in catalogs or magazines or on packaging documents of any kind or type, in advertising or on cardboard or other packaging material. Paragraph (b) of the order included an exception for certain parts numbers of Defendant Speed not material here except on the scope of the injunction.

[3]Presumably this refers primarily to the use of letters before or after parts numbers. The evidence indicates this to have been a practice by Defendant Speed (see IV below).

the consumers and the public into believing that Speed or its products were in any way "connected with, endorsed by, or licensed by Mr. Gasket Co." Further, defendants were not to do or attempt to do anything in the course of their business "likely to cause confusion as to the source of defendants' goods by confusing members of the public into the belief that defendants are in any way affiliated with Mr. Gasket Co."

Finally, the defendants were prohibited from any use, exploitation or divulgence of any confidential or proprietary information which individual Defendant Travis may have obtained while in the employ of the plaintiff.

The order awarded attorney fees, litigation expenses, and costs to the plaintiff to be paid by all the defendants under joint and several liability.

## II.

Although nine errors are assigned,[4] all are encompas-

---

[4]These are:

1. The finding of a deceptive trade practice by the trial court having the effect of appropriating the primary colors, red, blue, and orange, to the exclusive use of Mr. Gasket is reversble error for the reason that (i) "trademark" rights cannot be acquired by color alone, and separately (ii) such colors are standardly used in the industry.

2. The finding of a deceptive trade practice by the trial court having the effect of appropriating a numbering system to the exclusive use of Mr. Gasket is reversible error for the reason that such numbering system is standardly used in the industry.

3. The finding of a deceptive trade practice by the trial court on the grounds that defendants' packaging was confusingly similar is reversible error for the reason that all defendants' packaging has always been clearly labeled with is own distinctive logo.

4. The finding of a deceptive trade practice by the trial court having not required proof of secondary meaning as to Mr. Gasket's packaging is reversible error for the reason that such finding conflicts with the fundamental theory of federal pre-emption.

5. The finding of a deceptive trade practice by the trial court having not required proof of secondary meaning as to Mr. Gasket's packaging is reversible error for the reason that secondary meaning is a mandatory element of an action in unfair competition.

6. The finding of a deceptive trade practice by the trial court is reversible error for the reason that such findings is not supported by any substantial evidence.

7. The assessing of attorneys' fees on the finding by the trial

sed in the four principal issues raised by the defendants on appeal. These are:

(1) Whether legally, there can be a proprietary interest in color or numbers which is entitled to protection by injunction or other relief.

(2) Whether before that can be protection for a combination of factors used in trade dress there must be proof that the dress has acquired secondary meaning, and if so, was there such proof in this case.

(3) Whether deceit was practiced on the Court below in connection with plaintiff's exhibits 8 and 16, and exhibits 11, 12, 13, and 14.[5]

(4) Whether there was a basis for the award of attorney fees under R. C. 4165.03.[6]

---

court that defendants willfully engaged in a trade practice knowing it to be deceptive is reversible error for the reason that such finding is not supported by any substantial evidence.

8. The assessing of attorneys' fees on the finding by the trial court that defendants willfully engaged in a trade practice knowing it to be deceptive is reversible error for the reason that the burden of proof of "no knowledge" was placed on defendants.

9. The admittance into evidence of certain exhibits by the trial court is reversible error for the reason that such exhibits are incompetant [sic] physical evidence due to Mr. Gasket's fraud, misrepresentations and other conduct.

We do not reach any errors not assigned. See Rule 12(A), Appellate Rules.

[5]The defendants claim that Exhibit 8 (an exhaust gasket) was not stamped with a black on white "Mr. Gasket" while plaintiff sold only gaskets so stamped. Exhibit 16, a skin packaged gasket, had a flap attached which it is claimed furthered the deceit. Exhibits 11, 12, 13, and 14 are all photos of a Mr. Gasket pegboard display claimed to have been taken at Mr. Gasket's plant and to represent a suggested layout for retail stores. Defendant Speed claims that the Gasket layout pictured in the Exhibits 11-14, is an exact duplicate of a Speed layout at a Dallas Trade show (see Plaintiff's Exhibit 26) and was intended to deceive the trial court with respect to the similarity of Gasket and Speed retail displays.

[6]The relevant parts of Section 4165.03 provide: ". . . The court may award reasonable attorneys' fees to the prevailing party. Costs for attorneys' fees may be assessed against a plaintiff if the court finds he knew the action to be groundless. Costs for attorneys' fees may be assessed against a defendant if the court finds he has willfully engaged in the trade practice knowing it to be deceptive. . . ."

## III.

The applicable law⁷ is more easily stated than applied. For this reason there is relatively little controversy over the principles governing this case but a great deal over the consequences of that governance.

Federal pre-emption through patent, copyright, and trade-mark regulation has restricted state action in deceptive trade practice law to the prevention of confusion of sources⁸ by regulating such matters as trade dress, labeling, and passing off to prevent source confusion, *Sears, Roebuck* v. *Stiffel Co.* (1964), 376 U. S. 225, 232, 233, 11 L. Ed. 2d 661, 667-668; *Compco Corp.* v. *Day-Brite Lighting, Inc.* (1964), 376 U. S. 234, 238, 11 L. Ed. 2d 669, 672-673.⁹

---

⁷The relevant statute, R. C. 4165, provides in Section 4165.02 that "This section does not affect unfair trade practices otherwise actionable at common law or under other sections of the Revised Code." Our attention has not been directed toward any basis for substantive claim of deceptive practice other than those described in R. C. 4165.02 and particularly subsection (B) and (C) enumerating practices causing likelihood of confusion or misunderstanding as to source or affiliation, respectively. [Reference to "source" and "affiliation" here is shorthand for all the categories listed in those subsections. See note 1, *supra*, for the full text of R. C. 4165.02(B) and (C).]

⁸". . . The confusion for which the copier is held responsible, under the law of unfair competition, is not confusion resulting from the inability on the part of the public to distinguish between similar articles, one of which has been copied from the other. It is rather confusion as to origin, not of goods, which controls on the question of unfair competition; and it is only if there is such relationship or analogy between the goods of a complainant and those of a defendant that ordinary retail purchasers are likely to be deceived as to their origin that there is, in law, unfair competition." *West Point Manufacturing Co.* v. *Detroit Stamping Co.* (6 Cir. 1955), 222 F. 2d 581, 589, cert. denied, 350 U. S. 840.

⁹". . . Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods. But because of the federal patent laws a State may not, when the article is *unpatented and uncopyrighted*, prohibit the copying of the article itself or award damages for

In the remaining area, the only one in which the states have room to regulate, it is clear that protectable proprietary interests cannot be acquired in color or numbering as such. Neither trade-mark nor unfair competition concepts extend protection that far. See *Life Savers Corp.* v. *Curtiss Candy Co.* (7th Cir. 1950), 182 F. 2d 4, 9; *Campbell Soup Company* v. *Armour & Co.* (3rd Cir. 1949), 175 F. 2d 795, 798; *Diamond Match Co.* v. *Saginaw Match Co.* (6th Cir. 1906), 142 F. 727, 729 (colors); *Bechik Products Inc.* v. *Federal Silk Mills, Inc.* (D. Md. 1955), 135 F. Supp. 570, 577-578; *Mathews Conveyor Co.* v. *Palmer-Bee Co.* (6th Cir. 1943), 135 F. 2d 73, 84 (numbers). On the other hand if a constellation of characteristics has acquired a secondary meaning,[10] *i. e.*, a distinctive trade dress, an interest is created which a state can act to protect in order to pre-

such copying. Cf. *G. Ricordi & Co.* v. *Haendler* (C. A. 2d Cir. 1952), 194 F. 2d 914, 916." *Sears, Roebuck & Co.* v. *Stiffel Co.* (1964), 376 U. S. 225, 232-233, 11 L. Ed. 2d 661, 667-668. (Emphasis supplied.)

". . . That an article copied from an unpatented article could be made in some other way, that the design is 'nonfunctional' and not essential to the use of either article, that the configuration of the article copied may have a 'secondary meaning' which identified the maker to the trade, or that there may be 'confusion' among purchasers as to which article is which or as to who is the maker, may be relevant evidence in applying a State's law requiring such precautions as labeling; however, and regardless of the copier's motives, neither these facts nor any others can furnish a basis for imposing liability for or prohibiting the actual acts of copying and selling." *Compco Corp.* v. *Day-Brite Lighting, Inc.* (1964), 376 U. S. 234, 238, 11 L. Ed. 2d 669, 672-673.

[10] "The crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of those goods. To establish secondary meaning, it must be shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer." *Ralston Purina Co.* v. *Thomas J. Lipton, Inc.* (S. D. N. Y. 1972), 341 F. Supp. 129, 133.

It has been held that proof of secondary meaning is made sufficiently by the inferences to be drawn from mere copying, *Audio Fidelity, Inc.,* v. *High Fidelity Recordings, Inc.* (9th Cir. 1960), 283 F. 2d 551, 558; accord, *Clairol, Inc.,* v. *Andrea Dumon, Inc.* (Ill. Cir. Ct., Ch. Div., Cook County, 1969), 163 U. S. P. Q. 245, 249. Cf. *Winfield* v. *Charles* (1946), 77 Cal. App. 2d 64, 70; *National Van Lines* v. *Dean* (9th Cir. 1956), 237 F. 2d 688, 691. Query, whether this is the majority view. Cf. implicit criticism of *Audio* case, 77 Harv. L. Rev. 888, 916.

vent the likelihood of consumer confusion as to source, *Compco Corp.* v. *Day-Brite Lighting, Inc.,*[10] *supra,* note 8.

Because the likelihood of confusion fades to the point of extinction in the absence of an acquired secondary meaning[12] for the trade dress,[13] we adopt that view which holds that proof of secondary meaning is an essential element in the proof of likelihood of confusion of sources. See *Tas-T-Nut Co.* v. *Variety Nut & Date Co.* (6 Cir. 1957), 245 F. 2d 3, 7; *Lucien Lelong, Inc.,* v. *Lander Co.* (2 Cir. 1947), 164 F. 2d 395, 397. Stated in the flatest terms, the proposition is that if there is no secondary meaning, no consumer cares about the source and the likelihood of confusion, if any, is neutralized by apathy.[14] Thus the dispositive questions in this case are whether the plaintiff has sustained its burden of proving, see *The 88c Stores, Inc.,* v. *Martinez* (1961), 227 Or. 147, 153-154, 361 P. 2d 809, 812, secondary meaning for its trade dress and if it has, whether it has also established that such similarity exists between that dress and defendant's that the statutory test—"likelihood of confusion or misunderstanding"—is satisfied.[15] These is-

---

[11]Simulation of non-patentable products in contrast to trade dress simulation may be precise indeed without activating a protectable interest, *West Point Mfg. Co.* v. *Detroit Stamping Co.* (6 Cir.), 222 F. 2d 581, *cert. denied,* 350 U. S. 840 (1955). See also note 9, *supra.*

[12]". . . it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has *in fact* come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. . . ." *Crescent Tool Co.* v. *Kilborn & Bishop Co.* (2d Cir. 1917), 247 F. 299, 300.

[13]For the purposes of this opinion trade dress means that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale.

[14]Cf. note 12, *supra.*

[15]It is necessary, of course, that the requisite secondary meaning be developed by the time the defendant enters the competitive field. Cf. *Lucian Lelong, Inc.,* v. *Lander Co., supra.* See, also, *Marion Laboratories, Inc.,* v. *Michigan Pharmacal Corp.* (E. D. Mich. 1972), 338 F. Supp. 762, where the court, deciding a case arising under an unfair competition

sues are questions of fact. *The 88c Stores, Inc.*, v. *Martinez, supra*, at 153, 361 P. 2d at 812. See, also, *Zippo Manufacturing Co.* v. *Rogers Imports, Inc.* (S. D. N. Y. 1963), 216 F. Supp. 670, 679.[16]

## IV.

The plaintiff, Mr. Gasket Co., was formed in 1964 as a proprietorship and gradually expanded its original line of gasket products for the "high performance"[17] replacement market to include more than eleven hundred items for the same market.

The plaintiff devised a numbering system to identify replacement parts on different makes of cars, e. g., a 100 series for Chevrolet gaskets, a 200 series for Ford, and 300 series for Chrysler. It put its gaskets on identifying colored boards using, for example, blue for intake gaskets, red for exhaust gaskets, and orange for valve cover gaskets.

---

statute, said at page 769: "In order to sustain a claim of unfair competition, plaintiff must demonstrate that its product had obtained secondary meaning before the defendant entered the market. . . ." (citing cases)

[16]*Zippo* involved a suit for injunction based on a claim of unfair competition and trade-mark infringement. The problems of proof parallel those in the instant case. The court said with respect to proof:

"Therefore, plaintiff can obtain relief only if it meets its burden of proving that:

"(1) Defendant's lighter copies plaintiff's lighter;

"(2) A copied feature has acquired a special significance in the market identifying plaintiff as the source of the lighter, and that purchasers are moved in any degree to buy the lighter because of its source ('secondary meaning');

"(3) Such copied feature in defendant's lighter is likely to cause prospective purchasers to regard the lighter as coming from plaintiff;

"(4) Such copied feature is nonfunctional. It should be noted, however, that even if the copied feature is functional, plaintiff may still be entitled to relief if defendant has not taken reasonable steps to set its lighter apart from plaintiff's in the public mind."

[17]The high performance market in the automotive business refers to the market for parts enhancing the appearance or improving the performance of automobiles as opposed to mere replacement parts (Tr. 26, 207). Companies supplying this market may be direct manufacturers of products from raw materials or may order products to specification. The product is distributed in the trade dress of its source.

The boards were covered with a clear "skin" of plastic material drawn tightly over the product in place on the board.

Plaintiff also developed a logo,[18] revised in 1970 to include a block "G". Part of the logo was a small stylized figure of a man carrying a checkered flag (see Def. Ex. MM).

It is apparent from the record that the plaintiff has had a highly successful and expanding business and that a variety of the competitors for the high performance market have adopted numbering and packaging systems more or less the same as those employed by the plaintiff. Skin packaging, for example, is common and several competitors use a comparable numbering system adding only a letter or an additional digit for distinction. The gasket configurations of all competitors are of necessity identical in functional essentials for particular makes of cars. Otherwise, the gaskets would not fit. Mr. Gasket Co. has marketed its gaskets in both plain white material (Plaintiff's Ex. 8) and a grayish white material with a Mr. Gasket Co. stamp (Def's. Ex. MM).

The marketing of gaskets may be over the counter or from self-service peg boards but neither the plaintiff, Mr. Gasket Co., nor its competition, so far as the record shows, sells directly at retail. The customers in the high performance market may be a highly sophisticated trade from professional racers (about 15 percent, the trial court found).[19] By implication the remaining trade has its origin in the general public. Of course, there are distributors who purchase at wholesale for resale to the public.

Speed Industries, Inc., entered the gasket field in 1969 and by early 1971 had adopted much, if not all, of plaintiff's numbering system prefacing the numbers with an "S" or, in some instances with an extra digit.[20]

In addition, Speed Industries, Inc., used blue, red, and

---

[18]Apparently a contraction of the word "logogram" meaning a word letter or phonogram representing a word.

[19]Findings of Fact No. 4.

[20]See Appendix A, Plaintiff's Exhibits 8 and 34.

orange commercial coloring, respectively, for its boards mounting intake, exhaust, and valve cover gaskets. These colors were close, if not identical, to those used by Mr. Gasket Co.

In 1971, Speed Industries, Inc., also redesigned its logo to form a slanted block "S"[21] which closely resembled Mr. Gasket Co.'s logo.[22] However, the slanted block "S" logo was used only on a 1971 catalog for Speed Industries product distributed at a Dallas trade show and then withdrawn.[23] The record does not show that the slanted block "S" ever appeared in a Speed Industries logo attached to and identifying the source of a product.

There was testimony indicating extensive Mr. Gasket Co. advertising campaigns and business growth and that it had used its trade dress including logo, card colors and packaging techniques for a number of years. Mr. Robert Popkin, North Belmore, Long Island, New York, whose employer was a national sales organization for Mr. Gasket Co. testified that certain colors used by that company had become synonymous with particular gasket products and that "most customers who buy from a store were used to these particular items because they purchased them before." (Tr. 423) He also testified that anyone who "really didn't know the two lines would be definitely confused." (Tr. 428) His expert opinion was that a consumer would be confused (Tr. 456, 459). Mr. Denver McCoy of Elyria, a self-employed wholesaler and distributor of high performance auto parts including the Mr. Gasket Co. (but not Speed Industries, Inc.) products was of the opinion as an expert that consumers would be confused by the similarity in packaging and would believe that Mr. Gasket Co. and Speed Industries, Inc., were affiliated (Tr. 474-476). Although in his experience he had never seen a customer so confused (Tr. 478). Mr. Dennis Lee Holding, Vice President for Marketing, Mr. Gasket Co., testified that custom-

---

[21]See Appendix B, Joint Exhibit 13.
[22]See Mr. Gasket Co. logo on Plaintiff's Ex. 8, Appendix A.
[23]See Appendix B, Joint Exhibit 13.

ers for the company's product throughout the country had learned to identify his company's gaskets by colors and numbers. He also said that the numbers had "virtually become standard in the industry." (Tr. 83-84)

There was considerable evidence, both testimonial and real, aimed at demonstrating similarity in trade dress between Mr. Gasket and Speed products. There was also some evidence that one or more wholesalers and distributors, at least one at the Dallas show in 1971, were sufficiently impressed by catalog similarities (Tr. 85-86, 89) to inquire whether the two companies were affiliated, associated, or connected.

We turn to an analysis of the consequences of the proofs made in this case.

## V.

Apart from evidence of extensive advertising and growth of the business, all the evidence of secondary meaning for the plaintiff's trade dress came from three witnesses. Advertising and growth do not establish secondary meaning.[24] And none of the three witnesses provided specific, objective evidence of consumer identification of the product source with the trade dress.[25] The most that can be gleaned from the total testimony, weighed at its best for the plaintiff, is a conclusion of the witnesses, unattached to a base of evidentiary fact, that there is some confusion in the customers' minds. This confusion is said to originate in the asserted customers' recognition of plaintiff's product by its trade dress and the similarity between that

[24] See *General Time Instruments Corp.* v. *United States Time Corp.* (2d Cir. 1948), 165 F. 2d 853, 854-855, where it is said that large sales and large advertising expenditures measure the plaintiff's ". . . effort to establish a secondary meaning, but does not determine its success."

[25] It has been held that the testimony of witnesses " 'in close association and intimate contract' " with the plaintiff's business has little value in establishing secondary meaning. *Norm Thompson Outfitters, Inc.*, v. *General Motors Corp.* (9th Cir. 1971), 448 F. 2d 1293, 1297. See also *The 88c Stores, Inc.*, v. *Martinez, supra*, at 158-159, 361 P. 2d at 814. On this score all three witnesses in the present case were subject to some discount. However, the evidential deficiency in this case stems from a failure of proof.

trade dress and the aping of it by the Defendant Speed. Because it is the customers' confusion that counts, it is the likelihood of a mix of cognitions in the *public mind* which is essential if the plaintiff is to prevail.[26] Accordingly, as we have indicated the plaintiff must prove the secondary meaning before there can be a likelihood of confusion.[27] One is the foundation for the other. Both the secondary meaning and the likelihood of confusion based on similarity are elements of the proof.[28] At best *plaintiff has satisfied only the similarity test.*[29] On the second element it has at least provided the evidence from which a trier of the facts might properly deduce a probability of confusion *if the secondary meaning were established.*

There are methods for establishing secondary meaning. Direct customer testimony is one.[30] Some courts have admitted customer surveys.[31] There may be other modes of proof.

---

[26]See the discussion of a comparable problem in a trade-mark case. "In an action for unfair competition based upon the use of a trademark similar to the complainant's, the first inquiry must be to the question whether the public mind attributes to that mark a connection with the products or the business of the complainant" *Time, Inc.,* v. *Life Television Corp.* (D. Minn. 1954), 123 F. Supp. 470, 474.

[27]*Marion Laboratories, Inc.,* v. *Michigan Pharmacal Corp.* (E. D. Mich. 1972), 338 F. Supp. 762. "Since no secondary meaning was shown to have attached to plaintiff's product prior to defendant's entry, plaintiff has failed to meet its burden of proof as to its theory of unfair competition based on secondary meaning and confusion." *Id.* at 769.

[28]Cf. *General Time Instruments, Corp.,* v. *United States Times Corp., supra,* at 855: "Even if secondary meaning had been established, plaintiff could not have prevailed unless probable confusion would result from defendant's actions. Thus the plaintiff failed in its essential proof on both scores"

[29]"The burden of proving the facts of secondary meaning and confusion of source is on the plaintiff." (citing cases) *The 88c Stores, Inc.,* v. *Martinez, supra,* at 154, 361 P. 2d at 812.

[30]Cf. *Eastman Kodak Co.* v. *Royal-Pioneer Paper Box Mfg. Co.* (E. D. Pa. 1961), 197 F. Supp. 132, 134.

[31]*Zippo Manufacturing Co.* v. *Rogers Imports, Inc., supra,* at 682; cf. *Eastman Kodak Co.* v. *Royal-Pioneer Paper Box Mfg. Co., supra.* Hearsay may be a problem. Those courts allowing the survey evidence have worked out a rationalization of that issue satisfactory to them. See discussion in the *Zippo* case at p. 682.

However, we do not presume to tell a party how to present its case. It is enough that we conclude that whatever methods would produce evidence sufficient to meet the burden of proof not one of them was used in this case to carry plaintiff's burden.

## VI.

These questions remain: (1) the effect of the admission of Plaintiff's Exhibits 8, 16, 11, 12, 13, and 14; (2) the legal justification for the trial court's award of attorneys' fees, including the question whether the trial court improperly put the burden of proving wilful knowledge of deception on the defendant; and (3) whether the injunction is impermissibly broad.

We have examined the challenges directed to the exhibits and find them without merit. From the record it appears that the trial court understood the exhibits and was not misled. Therefore, if their admission was error, it was harmless.

The statutory authority for the award of attorney fees in actions of this kind is clear, cf. R. C. 4165.03.[33] However, it is a permissive authority for an award to the party prevailing under R. C. 4165.02. Until the matter of secondary meaning is cleared (see VII below), it will not be known which party prevailed. Therefore, an award of fees is premature and that award is set aside.

When it has been decided which party has prevailed, it will be time to consider the assessment of attorneys' fees. The conditions requiring payment of such fees by a defendant are met when it has been determined that a defendant "has wilfully engaged in the trade practice knowing it to be deceptive." It seems clear that the legal conclusions of the trial court in the present action will fairly support an interpretation that the proofs adduced by the plaintiff were sufficient to make a prima facie case of wilful engagement in a practice intended to be deceptive. On the basis of tenable inferences from the evidence we can-

---

[33]See note 6, *supra.*

not say that conclusion was unjustified. When the trial court then spoke of the defendant having:

". . . offered no evidence or explanation to show that their conduct of which plaintiff complains was in pursuit of some legitimate and lawful purpose. . . ." It was simply saying that the plaintiff's evidence was sufficient to shift the burden of going forward. This is not the same thing as shifting the burden of proof. Defendant's claim on this point lacks substance.

## VII.

In our view, the injunction is overbroad. The statutory protection was not intended to put out of business one charged as the corporate defendant here was charged.[33]

Both parties supply the parts and products for the same automotive models and makes. Because this is so it is unreasonable not to allow similar or identical descriptions and number sequences with a distinguishing alphabetic prefix or suffix coupled with a distinctive logo clearly identifying the source. Nor can the plaintiff acquire a proprietary interest in any color use per se. It is sufficient that a successful plaintiff be protected against the conjunctive use of particular features of trade dress which have acquired a secondary meaning associated with the identification of the plaintiff's products. This limitation will be enough to stop that confusion or misunderstanding of "source", "sponsorship", "affiliation", "connection", or

---

[33]Statutes prohibiting deceptive practices could not be so aimed without running afoul of anti-monopoly policy. Compare the language of Judge Learned Hand in *Crescent Tool Co.* v. *Kilborn & Bishop Co., supra,* at 301: "When the appearance of the goods has in fact come to represent a given person as their source, and that person is in fact the plaintiff, it is impossible to make these rights absolute; compromise is essential, exactly as it is with the right to use the common language in cases of 'secondary' meaning. We can only say that the court must require such changes in appearance as will effectively distinguish the defendant's wares with the least expense to him; in no event may the plaintiff suppress the defendant's sale altogether." Some courts have held that the relief granted may be broader when the infringement is not innocent. See *Time Inc.* v. *Life Television Corp., supra,* at 480,

"certification" which the statute (see footnote 1) was designed to impede. However, it is unnecessary to determine the exact scope of a proper order at this juncture.

The cause will be remanded for further proceedings on the issue of secondary meaning.[34] Assuming, arguendo, that secondary meaning is established, then will be the occasion for an order precise enough to protect the interests of both parties. Of course, should there be a complete absence of evidence supporting a secondary meaning, no injunctive relief would be appropriate.

Reversed and remanded for further proceedings according to law.

*Judgment reversed.*

JACKSON, J., concurs.
MANOS, C. J., dissents.

MANOS, J., dissenting. I believe the trial judge's findings of fact are supported by the record and that he correctly applied the law.

The court made the following findings:

"9. a. There can be no doubt that in early 1971 defend-

---

[34]In the light of App. Rule 12(C) we take this course rather than entering final judgment for the appellant. Our action is founded on a premise, derived from reading the whole record, that the trial court was mistaken either in assuming that proof of secondary meaning was not required or, if required, that it need not be made by proofs that the *public* was mislead. By public we mean potential retail customers for the merchandise in issue. Viewed in this light the judgment below was based on an erroneous conception of evidential requirements. This was a mistake of law not justifying this court in entering final judgment for the appellant but rather requiring further trial proceedings on the issue (secondary meaning) inadequately made. Perhaps the proof cannot be adduced. Further proceedings in the trial court will determine that. At least any such omission after retrial will not be the consequence of a mistake of law. Cf. *Peters Motors, Inc.,* v. *Rodgers* (1954), 161 Ohio St. 480, 485, affirming retrial for appellant who honestly but mistakenly thought a stipulation covered a necessary element of its proof.

ant Speed did change (1) its 'logo', (2) its catalog appearance, (3) its number and price system in said catalog, and (4) its color scheme for its skin card pack so as to closely approximate that of plaintiff. Although clearly distinguishable upon close examination this is often not so when viewed from as few as ten feet and beyond The court can infer no purpose other than to cause some prospective customers, by willful deception, to buy Speed products with confidence, relying upon their experience with or the reputation of plaintiff; also, that the defendants must have known that their acts were deceptive. Defendants offered no credible and rational proof of any other purpose.''

The function of an appellate court is not to re-evaluate the evidence presented below, but to determine if evidence of substance exists to support the trial court's findings of fact.

From his findings of fact the trial judge concluded that the defendant deliberately copied all the distinctive characteristics of the plaintiff's trade dress and labeling *to confuse* retailers, distributors and the public as to the source of the goods. He found the simulation to be so extensive as to allow an inference of intent to deceive. This intent leads logically to the likelihood of confusion absent proof to the contrary. To me there is a difference between a scheme to deliberately deceive and a legitimate attempt to compete. The former should be enjoined.

I therefore would affirm.

82

PLAINTIFF'S EXHIBIT 34

PLAINTIFF'S EXHIBIT 8

APPENDIX A

THE
GASKET
SPECIALIST

1971 HI-
PERFORMANCE
PRODUCTS
CATALOG

APPENDIX B