ABERCROMBIE & FITCH STORES, INC., Plaintiff,

v.

AMERICAN EAGLE OUTFITTERS, INC., Defendant.

No. C2–98–569.

United States District Court, S.D. Ohio, Eastern Division.

July 12, 1999.

Frank J. Colucci, Richard Jacobson, Courtney Monahan, W. Brant Mossop, Colucci & Umans, New York, NY, Melvin Donald Weinstein, Kegler Brown Hill & Ritter, Columbus, OH, for Plaintiffs.

Lynda M. Braun, Robert S. Sugarman, Weill, Gotshal & Manges, New York, NY, Joel Robert Chambers, Wood, Herron & Evans, Cincinnati, OH, for Defendants.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

This action was filed by Abercrombie & Fitch Stores, Inc. ("A & F") against American Eagle Outfitters, Inc. ("American Eagle") asserting claims under the Lanham Act, 15 U.S.C. § 1125(a), the Ohio Deceptive Trade Practices Act, and the common law of trade dress infringement and unfair competition. A & F claims that the way in which American Eagle has chosen to market its goods, which are similar to goods sold by A & F, deliberately copies A & F's promotional and marketing materials and therefore infringes upon A & F's rights in its marketing presentation. In response to the complaint, American Eagle filed a motion for summary judgment which argues that, whether or not American Eagle has intentionally copied A & F's marketing approach for the goods in question, it has infringed no rights belonging to A & F because A & F has no rights, and cannot acquire rights, in the type of generic marketing devices which are described in the complaint. The summary judgment motion has been fully briefed and is ripe for decision.

### I.

Fed.R.Civ.P. 56(c) provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. The Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *accord, County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on *documentary* evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord, Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.1984), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes*, 398 U.S. at 157–60, 90 S.Ct. 1598; *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. As is provided in Fed.R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (footnote omitted).

## II.

Although, as noted above, when faced with a summary judgment motion, the Court is required to examine any submitted factual materials in the light most favorable to the non-moving party, the primary emphasis of American Eagle's summary judgment motion is that the complaint itself is insufficient to state claims under either the Lanham Act or Ohio law. Consequently, although the Court will refer to some extent to the additional materials submitted with the summary judgment motion, the focus of the factual statement in this Memorandum and Order will be the allegations of the complaint itself.

A & F describes itself as a "retailer of men's and women's casual clothing, such as t-shirts, outerwear, sweatshirts, woven shirts, sweaters, jeans, khakis, shorts, baseball caps, belts, socks, and other accessories ... designed primarily to appeal to young men and women of college age...." This collection of clothing, taken

together, is referred to by A & F as the "Abercrombie Brand," and this merchandise is sold throughout the United States under registered trademarks and service marks ("Abercrombie & Fitch," "A & F Co.," "A & F," and variations of these marks). Complaint, paragraph 5. This case is not, however, about infringement of any registered trademarks and service marks.

Rather, according to paragraph seven of A & F's complaint, the merchandise collectively described as the "Abercrombie Brand" has acquired a "unique and inherently distinctive image" (referred to in the complaint as the "Abercrombie Trade Dress") which consists of nine separate features. Those features are (1) some use of the Abercrombie marks; (2) the use of the word "performance" on labels, advertising and promotional materials; (3) the use of the words or phrases "authentic," "genuine brand," "trademark," and "since 1892" on labels, advertising and promotional material; (4) the use of the word "outdoor" in the same materials; (5) the use of certain "design logos" and product names for types of clothing which convey "the image of an athletic line of casual clothing;" (6) the use of primary color combinations in connection with solid, plaid, and stripe designs to "create a consistent design and color palette;" (7) the use of all natural cotton, wool and twill fabrics to "create a consistent texture palette"; (8) the creation of a "cool" or "cutting edge" image through advertising which features clothing in a "cutout" style and which combines "a consistent conceptual theme with a lifestyle editorial content of music, electronics, books and magazine features ... printed on a cougar vellum paper;" and (9) the use of indoor signage and display set-ups and the employment of a sales associate team of college students to create a "consistent Abercrombie merchandise look in Abercrombie stores...." A & F alleges that these unique features are "closely and universally associated with Abercrombie" and are used by the public to identify the source and origin of A & F's goods.

A & F also alleges, in paragraph ten of its complaint, that American Eagle sells exactly the same type of merchandise in 300 locations nationwide. With minor variations, A & F also alleges that American Eagle has intentionally copied its trade dress, although it is alleged to use its own trademarks, particularly the "AE" trademark and information about the duration of its presence in the market (i.e., "since 1977" instead of "since 1892") in describing its goods. The most notable exception is the absence of any allegation that through in-store displays and the hiring of a sales associate staff consisting primarily of college students American Eagle has recreated the A & F look within its stores. In particular, A & F asserts that the Fall 1997 A & F catalog was copied by American Eagle, and that American Eagle's catalog features the same products (such as shirts, Jeans, sweatshirts, boxer shorts, sweater vests, jackets and pajamas), that these goods are the same color, have the same design, and are made from the same fabrics as A & F's goods, that certain "product names" (i.e., "vintage" sweatshirts and "field jerseys") are used in the American Eagle catalog, and that the paper, style of displaying merchandise, and even the typeface are identical to those used by A & F. *See* Complaint, paragraph 13. The complaint concludes by alleging that although A & F requested American Eagle to stop copying its advertising styles, this "deliberate and intentional pattern of copying" has "escalated" to the point where consumers are beginning to wonder if A & F and American Eagle are connected in some way. A & F seeks both injunctive and compensatory relief as well as punitive damages and attorneys' fees.

For purposes of the summary judgment motion, American Eagle has not contested the allegation that it has intentionally copied the various matters described in the complaint. Rather, it centers its attack on the assertion that these matters, even if used in the way described in the complaint,

constitute legally protectable trade dress. The only additional facts which American Eagle seeks to put before the Court are representative samples from other advertising of similar clothing, for purposes of reinforcing American Eagle's argument that all of these matters are generic and commonly used in the clothing industry and therefore cannot uniquely identify casual clothing with any particular source so as to constitute a protectable trade dress. Examples of other retailers who use similar features in their advertising include Land's End, J. Crew, Polo, Aeropostale, Nike, The Gap, Nautica, Eddie Bauer, and L.L. Bean. American Eagle has also submitted various A & F catalogs to show that A & F does not consistently use all of the elements of the "trade dress" described in the complaint. In response, A & F does not dispute the fact that many of the elements of its claimed "trade dress" are used by other clothing retailers, but asserts that its unique combination of those elements is protectable and that American Eagle's alleged copying of that same combination of elements is therefore an infringement. Because there are no additional facts which are important to the Court's decision, the Court now turns to the appropriate legal analysis of A & F's assertion that its complaint adequately states a claim for relief under the Lanham Act.

### III.

■ Perhaps the leading case from this circuit which describes the general principal trade dress protection is *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts,* 944 F.2d 1235 (6th Cir. 1991), *cert. denied* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). Ferrari recognized that Lanham Act protection extends to an unregistered trade dress, which it described as "the image and overall appearance of a product." *Id.* at 1238. In other words, a trade dress "embodies 'that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale.' " *Id.,* quoting *Mr. Gasket Co. v. Travis,* 35 Ohio App.2d 65, 72 n. 13, 299 N.E.2d 906 (1973). In *Ferrari,* the Court assumed that the "unique exterior design and shape" of a Ferrari automobile constituted its trade dress, *id.* at 1240, and then proceeded to discuss whether that trade dress had acquired secondary meaning. The Court noted that trade dress protection is not available for functional features, which the Court described as matters either essential to a product's use or which affect its cost or quality. *Id.* at 1246.

■ Following *Ferrari,* it is clear that a trade dress, while not easy to define with precision, consists of (1) either a singular feature, or a collection of features which, when considered as a whole, take on some type of singular or distinct arrangement; (2) which are intended by the maker of the product to permit the public to identify it as coming from a particular source; and (3) which have the tendency to do so. Although this may be a useful working definition of a trade dress, the question of whether a particular trade dress is *protectable* involves some additional considerations.

■ Until the Supreme Court's recent decision in *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), there was some disagreement among the courts about whether a claim for infringement of a trade dress, brought under the Lanham Act, could succeed only when the owner of the trade dress was able to demonstrate that the trade dress had acquired a "secondary meaning"—that is, that the trade dress " 'has become distinctive of the applicant's goods in commerce.' " *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753, quoting 15 U.S.C. §§ 1052(e)(f). *Two Pesos* established that proof of secondary meaning is not required if the trade dress is "inherently distinctive," meaning that the means chosen by the owner of the trade dress to

describe its product "is capable of identifying a particular source of the product" without proof that the consuming public has actually made such an identification. *See id.* at 771, 112 S.Ct. 2753. Thus, following *Two Pesos*, trade dress is protectable under the Lanham Act either if it is inherently distinctive, or if it is a valid trade dress that, while not inherently distinctive, has come to be associated in the consuming public's mind with a particular product.

A situation not specifically addressed in *Two Pesos*, other than in passing, is the situation presented in this case. A & F has alleged in its complaint that its arrangement of words, colors, and format has acquired a secondary meaning, and because that is a factual issue which the motion for summary judgment does not address, the Court is required to accept that assertion as true. The legal question posed by the motion is not whether A & F's particular method of identifying its products is one which the consuming public has come to associate with A & F; rather, the issue is whether what is described in A & F's complaint is a "trade dress" at all.

 There are various reasons why a court will choose not to afford trade dress protection to a product originator's choice of design, labeling, advertising, or other means of attempting to identify the product's source of origin. The most common reason is that the means chosen is "legally functional"—that is, that "it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos*, 505 U.S. at 775, 112 S.Ct. 2753, *citing Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 426 (5th Cir. 1984). Allowing the concept of protectable trade dress to spill over into functional or descriptive identifiers would be anticompetitive, because it would impose limits on a seller's ability to choose the ordinary and natural means of identifying for the consuming public the types of goods being offered for sale. There is, after all, a strong public policy "in favor of vigorously competitive markets," and giving too much protection to language that is naturally descriptive of the goods offered for sale would create a "linguistic monopoly." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir.1997). Precisely in order to avoid this result, "[o]nly nonfunctional, distinctive trade dress is protected under § 43(a) [of the Lanham Act]." *Two Pesos*, 505 U.S. at 775, 112 S.Ct. 2753. Consequently, the Court must determine if the "Abercrombie Brand" can, as a matter of law, qualify as a protectable trade dress even assuming that it has acquired secondary meaning in the marketplace.

 American Eagle contends that the "Abercrombie Brand" is nothing more than a combination of descriptive techniques and language that is common to any effort to sell similar products, and that it is simply a generalized marketing theme or generic concept that does not enjoy Lanham Act protection. It is generally held that an "abstract image or marketing theme of a product," a generalized and common marketing approach, or a "generic idea or concept" is not protectable trade dress. *See McCarthy on Trademarks and Unfair Competition*, 4th Ed. Vol. 1, § 8.6, at 8–18 to 8–21. Consequently, although trade dress can consist of a catalog layout, *see Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654 (4th Cir.1996), and can also consist of a distinctive grouping of common elements, *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 647 F.Supp. 1533 (D.Colo. 1986), *aff'd* 846 F.2d 1268 (10th Cir.), *cert. denied* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), there are some catalog layouts which are so descriptive and/or generic that to afford them protection would unduly restrict competitors' ability to describe and offer for sale their own legitimately competitive products. If a marketing approach falls into this latter

category, because it lacks legal protection, even a blatant and wholesale copying of that approach is not actionable. *See, e.g. Haagen–Dazs v. Frusen Gladje, Ltd.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980) (no cause of action exists to enjoin a competition from "legitimate imitation of an admittedly effective marketing technique" if the technique itself is not a protectable trade dress).

■ As described above, the essential features of the "Abercrombie Brand" are the following. First, A & F uses its own trademark in its advertising. Second, it uses a variety of words in its advertising, including descriptive terms such as "performance" and "outdoors," and other terms that suggest a proprietary source (e.g. "authentic" or "trademarks."). Third, it uses words and images suggestive of athletes, particularly for clothing either suited to athletic pursuits or for athletic people. Fourth, it uses certain color and design combinations (e.g. primary colors and plaids, solids and stripes). Fifth, it uses certain natural fabrics such as wool or cotton. Sixth, it uses a "lifestyle" catalog approach to suggest that people who are perceived (or who perceive themselves) as "cool" or on the "cutting edge" (presumably in the world of fashion and youthful lifestyle) wear the types of clothing being offered. That approach incorporates various non-clothing elements of the "cool" lifestyle including music, electronics, and books. Lastly, it typically (but not exclusively) pictures its merchandise in a "cutout" style as opposed to showing it on models or against other backgrounds. For the following reasons, the Court concludes that, regardless of any public identification of this type or style of advertising with products sold by A & F, it is simply too descriptive and generic to qualify for Lanham Act protection.

■ There can be no question that catalog advertising is common to many major clothing retailers, and that such advertising is merely a marketing style or method which cannot acquire trade dress protection. Within the scope of advertising certain types of clothing, retailers must be free to use common verbal or pictorial descriptions of their goods without fear that they can be held liable for infringement. At a minimum, those would include such matters as showing the clothing in "cutout" fashion—which is one of a very limited number of ways to depict an article of clothing—and using combinations of standard colors (red, blue, yellow), universally-recognized patterns (solids, stripes or plaids), and common fabrics (wool and cotton) in clothing design and manufacture. It also includes associating active wear with sports; it is difficult to envision advertising a line of athletic or athletic-looking clothing without using words or symbols describing athletic endeavors. All of these factors are both generic and descriptive, and to forbid other clothing retailers from adopting similar methods of advertising would be unduly anticompetitive.

The Court recognizes that a combination of generic or descriptive elements can sometimes create a unique look that is protectable, but there is nothing arbitrary or fanciful, or in any way distinctive, about the combination of these elements in a clothing catalog that would make the whole of the "Abercrombie Brand," at least as it relates to the descriptive language, color combinations, and cutout style, something more than the sum of its non-protectable parts. That observation applies equally to the use of words claiming that the clothing is "authentic" and the use of A & F's own trademark; surely any advertiser of any product can claim that its products are authentically produced by its own production methods, and can use its own trademark in advertising as a way to promote that concept. These are nothing more than "common features ... that are aimed simply at giving customers information about the product," *see Regal Jewelry v. Kingsbridge Int'l*, 999 F.Supp. 477, 489 (S.D.N.Y.1998), or the unprotectable concept of using one's own trademark as part

of product advertising. *See, e.g., Nature's Way Products v. Nature–Pharma, Inc.,* 736 F.Supp. 245, 249 (D.Utah 1990) (Lanham Act protects trademarks but not marketing practices involving the use of trademarks).

The only element of the "Abercrombie Brand" which has not yet been discussed is the method of appealing to the "cool" or "cutting edge" consumer by use of a catalog that features not only the advertised products but certain "lifestyle" elements relating to books, music, or electronics. Certainly, not every clothing retailer would naturally choose, or be limited to choosing, such a marketing approach. Nonetheless, this is simply a marketing theme which cannot acquire trade dress protection. Just as the use of a Scandinavian theme to market premium ice cream products—something that is neither generic nor descriptive of ice cream in the abstract—is not a "trade dress," *see Haagen–Dazs v. Frusen Gladje, Ltd. supra,* neither is the concept of marketing products to "cool" or "cutting edge" consumers by appealing to other aspects of their lifestyle protectable. Certainly, the manufacturers of products other than clothing are free to use "lifestyle appeal" marketing, and the Court believes such marketing is a common enough technique among retailers that limiting its use to a single retailer would be an unwarranted expansion of the trade dress concept. For all of these reasons, the Court rules as a matter of law that the "Abercrombie Brand," as described in the complaint and as illustrated by the materials submitted in connection with the motion for summary judgment, does not enjoy trade dress protection under § 43(a) of the Lanham Act.

## IV.

The Court has concluded that A & F has not demonstrated that its chosen advertising method includes a trade dress that is protectable under § 43(a) of the Lanham Act. As A & F concedes in its responsive memorandum (file document # 22, at 22),

"Abercrombie's claims under Ohio common law and the Ohio Deceptive Trade Practices Act are related to its claims under Section 43(a) of the Lanham Act and are subject to essentially the same analysis in assessing unfair competition under Section 43(a)." Consequently, American Eagle is entitled to summary judgment on all of A & F's claims. American Eagle's motion for summary judgment (file document # 11) is therefore GRANTED and this case is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment in favor of the defendant.