**JEWEL COMPANIES, INC., Plaintiff,**

v.

**The WESTHALL COMPANY, Defendant.**

**No. C 73–1150.**

United States District Court,
N. D. Ohio, E. D.

Jan. 30, 1976.

Robert M. Newbury and Robert G. Ulrich, Chicago, Ill., James M. Porter, Cleveland, Ohio, for plaintiff.

Marvin L. Karp, Ronald H. Isroff, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

The above-styled case is brought by plaintiff to remedy what it alleges has been unfair competition and trademark infringement by the defendant. Plaintiff contends that it has a valid mark, that being "Jewel," which has been improperly used by defendant in its operation of retail stores, which are known as "Jewel Mart" Stores. The claims made by plaintiff arise under the federal trademark and unfair competition laws (15 U.S.C. § 1051, *et seq.*), under the Ohio Deceptive Trade Practices Act (Ohio Revised Code § 4165.02), and under the common law of Ohio. Plaintiff seeks injunctive relief barring defendant's use of the word "Jewel" and an accounting. The matter was tried to the Court and the following constitute Findings of Fact and Conclusions of Law:

## I. FACTUAL BACKGROUND

### A. *Jewel Companies, Inc.*

Plaintiff is a New York corporation which has its headquarters in Chicago. The corporation is composed of several divisions, all of which are involved in retail sales of merchandise. Some of these divisions operate under names other than "Jewel" and for purposes of this case, attention was

focused on the Jewel Home Shopping Service.

The Jewel Home Shopping Service was the cornerstone of plaintiff's present operation. It began in 1899 as Jewel Tea Co., a home delivery system for tea and coffee in the Chicago area. As business grew, other grocery items were added. There were coupons given to customers, as appears to have been the common practice among route sales operations like Jewel Tea. The coupons were used to acquire other merchandise, referred to as "premiums." Premiums commonly used were silverware and china.

The Jewel Tea route system was successful and growth was steady. Subsequent to World War II, however, the development of modern packaging techniques and the developments of supermarkets threatened plaintiff's main line of business, the delivery of grocery items, and plaintiff altered its operations. It entered into a catalog sales program whereby route customers could order from catalogs provided by their route man various items of general merchandise, which items would then be delivered by the route man on subsequent visits. The sales of general merchandise by the Jewel route system has increased by reason of this change in emphasis but a significant portion of today's sales still involve grocery or household items.

The home delivery of the products sold has always been accomplished by Jewel through its route personnel, all of whom operate trucks carrying the Jewel mark. There presently are 1500 routes served by the Jewel Home Shopping Service, these routes located in 40 states including Ohio. In fact Ohio is one Jewel Home Shopping Services primary markets, having had approximately $6,500,000 in annual sales in each year since 1967. Advertising and promotion of the Jewel Home Shopping Service has been primarily carried out through the service itself and promotional materials given to the existing customers. Non-customer advertising has been limited to

house-to-house calls by new customer representatives. Plaintiff demonstrated that its total annual expense in promoting the Jewel Home Shopping Service has been in excess of $1 million per year since 1965.

There are, as noted, a number of other divisions operated by plaintiff and it was this factor which occasioned plaintiff's name change in 1966, from Jewel Tea Company to Jewel Companies, Inc. Total sales for plaintiff in 1974 amounted to $2.5 billion.

### B. *Westhall Company*

Defendant is an Ohio corporation with headquarters in Akron, Ohio. For over 50 years, it has been in the retail jewelry business operating "Rogers Jewelry" and "Ross Jewelry" stores in Ohio. Defendant also has stores in West Virginia and throughout the South, the latter being constituted by defendant's operation of the jewelry sections in Sterchi department stores and Mill Discount Drug Stores.

In 1972, defendant began evaluating the feasibility and desirability of operating a catalog discount store. Defendant determined to proceed into this mode of retail selling and decided to open two catalog discount stores, one in Cuyahoga Falls, Ohio and the other in Youngstown. After considering several names, defendant's board of directors hit upon the name "Jewel Mart." It is quite clear that while certain of the board members had heard of Jewel Tea Company, the decision to use the name "Jewel Mart" was in no way a decision based on the desire to unfairly compete with plaintiff.[1] The name was selected, rather, because jewelry was a high profit line of merchandise in which defendant had specialized and hoped to continue to sell in quantity at its new stores, and "Mart" conveyed the idea of a large discount operation.

The name "Jewel Mart" was subsequently registered with the Secretary of State of Ohio as being used in connection with retail

---

1. Motive is not relevant, however, in determining whether plaintiff is entitled to protection. Nonetheless it is a factor properly assessed by courts in regard to the likelihood of confusion, a matter which will be dealt with subsequently.

sales of jewelry, small appliances, beauty care items, luggage, etc.

The Cuyahoga Falls "Jewel Mart" began operations in October 1972, with the Youngstown store opening a year later. It was between these two openings that plaintiff first contacted defendant and attempted to secure defendant's voluntary cessation of the use of the word "Jewel". When efforts at negotiation failed, this action was instituted.

## II. PARTICULAR FINDINGS

From the evidence presented at trial, the Court finds the following matters to be of particular significance in the decision in this case:

A. It has been stipulated by the parties that at no time did defendant sell any products of the kinds listed in plaintiff's registrations of the mark "Jewel." Moreover, a review of the catalogs used by Jewel Home Shopping Service indicates that few, if any, of the items marketed through present day Jewel routes use the "Jewel" mark. Rather plaintiff purchases the products of other trade mark holders and sells them to route customers.

B. The evidence presented makes clear that the primary advantage of the Jewel Home Shopping Service is that, as its name indicates, customers may remain at home and make purchases of the products offered, with delivery also to be made to the home.

For example, in 1972, Leo J. Shapiro and Associates conducted a survey of the Jewel Home Shopping Service to determine how that operation could be improved and expanded. The results of the survey and the opinion of the researchers stressed the role of the Home Shopping Service in competing with direct marketing retailers, like Sears Catalog operations, for example. The recommendations as to future expansion reflected the importance of home delivery to Jewel's continued success. It was the home delivery capability that made Jewel unique.

Another indication of plaintiff's own view of the significance of its mark, "Jewel," comes from a letter from plaintiff's general counsel. The letter dealt with the issue of product confusion which might arise from a particular use of the "Jewel" mark and in the letter it was indicated that confusion was unlikely due to plaintiff's particular method of distributing its products. This attitude is reinforced by the covers on catalogs distributed by the Jewel Home Shopping Service route personnel which stress that this is a system whereby the customer can shop at home with all the convenience that such a program affords.

Finally, the president of Jewel Home Shopping Service, Walter Elisha, indicated that it was the home delivery aspect of this portion of plaintiff's business which made it unique.

C. Defendant's Jewel Mart on the other hand, is a catalog discount store operation, which has no trucks and provides no home delivery. Customers must come to the store and make purchases there. It is a retail operation through which the defendant hopes it will sell a considerable volume of jewelry. The store itself is quite large and contains samples of the items available for sale. It is properly described as a "Jewel Mart."

Plaintiff contended that "Jewelry Mart" would have been a better name but the Court finds the explanation given for the rejection of that name, i. e. it did not sound as smooth, is satisfactory. There is simply no evidence of any intentional copying.

D. There was considerable evidence presented which indicated that plaintiff has established in the minds of the public a connection between the "Jewel" mark and a home delivery service. There were 18 consumer witnesses who testified both in court and by videotape [2] on their familiarity with Jewel Home Shopping Service and their association of Jewel Mart with this service upon their hearing of the opening of defendant's store in Cuyahoga Falls. There

---

2. Upon a review of the objections made during the testimony presented on videotape, the Court finds none to be so substantial as to require the striking or disallowance of any of the testimony. The objections are accordingly denied.

was the Shapiro survey which established that the Jewel mark was well-known as being associated with an in-home shopping service.[3] And there was also evidence of the considerable expense which plaintiff has incurred in promoting the Jewel Home Shopping Service.

These factors taken together indicate that plaintiff has established in the minds of the consuming public an identity such that the mark "Jewel" used in connection with an in-home shopping has come to indicate plaintiff as the origin of that service.

■ E. The 18 consumer witnesses who testified that they were "confused" as to the relationship between Jewel Home Shopping Service and Jewel Mart did so in a weak fashion. In sum, their statements indicated that they "thought" that there "might" be a relationship between the two, they "assumed" that there was a relationship, or as another witness indicated, upon thinking about what company Jewel Mart was connected with, she thought of Jewel Tea because of the similarity of names and the process of association. This is a very weak degree of confusion. The strongest confusion would have been that which resulted in a customer going to Jewel Mart and making a purchase *because* the customer thought the store was operated by Jewel Tea. There is no indication at all that such a situation, or one approximating it, developed. By and large, the 18 witnesses were not too concerned about whether or not there was a tie-in between the two.

F. The word "jewel" is a common term and it appears in the name of a wide variety of companies located throughout the United States. There is evidence in the record of scores of firms listed in telephone

books from many locales, all of which bear the name Jewel. There is the trademark search report done for plaintiff by Thomson and Thomson Inc. in 1973 which reflects, again, many companies using the word "jewel" in their names and marks. In short, it is a common descriptive noun which many, many firms have used because of its connotation of high value or good quality.

G. Finally, there is no similarity at all in the physical appearance of the two marks.

### III. LEGAL CONCLUSIONS

■ It is very well-established that trademark infringement actions are but an aspect of the broader field of unfair competition. Moreover, although this action is predicated upon both trademark infringement and unfair competition, it is only upon the latter issue that evidence has been introduced, the parties having stipulated that defendant sold no products of any kind as to which plaintiff had registered its mark. The Court finds that for both of the above reasons, the law of unfair competition is the body of law to which the Court should refer in deciding the issues presented. Further while there are claims made by plaintiff under the Ohio common law and the state deceptive practices statutes, the analyses to be applied by the courts in regard to these bases of relief are essentially the same as those applied in assessing unfair competition under the federal statutes. See *Mr. Gasket Co. v. Travis*, 35 Ohio App.2d 65, 299 N.E.2d 906 (1973) and *Younker v. Nationwide Mutual Insurance Co.*, 175 Ohio St. 1, 191 N.E.2d 145 (1963). Accordingly, the discussion that follows will not differentiate between the various statutes and the Ohio common law.

---

3. Much has been made by defendant of the inadequate control and supervision exercised over the Shapiro survey. The survey was made before the problems between plaintiff and defendant developed. It was conducted for business purposes, to help plaintiff plan the future of its Home Shopping Service operation. While the Court would prefer that evidence of this kind be prepared under wholly sanitary procedures to insure the accuracy of the results, the inadequacies raised by defendant go to the weight to be accorded the survey not its admissibility. The plaintiff qualified Leo Shapiro as an expert witness and the report was submitted in connection with his capacity as an expert witness, it reflecting his opinion and the factors upon which that opinion was based. Defendant presented no countervailing evidence and the Court finds that the report is sufficiently accurate to warrant the findings made from it.

■ In developing the law of unfair competition and trademark infringement, the courts have taken a logical approach. There is a strong desire to protect the rights of the first user of the mark. This arises from a sense of basic fairness, more then from any particular concept of property law. *Jewel Tea Co. v. Kraus*, 187 F.2d 278, 282–3 (7th Cir. 1951). After all, the first user recognized the value of the mark and went through the effort necessary to establish the mark as a meaningful symbol. To allow others to usurp that mark and gain from the first user's efforts is unjust. And viewed from the consumers position, such conduct is an unfair trade practice in that it deceives the purchaser or user. It is a fraud on the public, as it were, which the courts will not tolerate.

■ On the other hand, the courts have been reluctant to allow a company to acquire all the rights to a common word, one in regular use. As the Supreme Court observed in *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.*, 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536 (1911), no one is allowed to have exclusive rights in a mark which others can employ with equal truth for the same purpose, or in other words, one cannot wholly appropriate to private use a generic or descriptive term. *See also Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) and *American Aloe Corp. v. Aloe Creme Laboratories, Inc.*, 420 F.2d 1248 (7th Cir. 1970), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 and 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47, *reh. denied*, 400 U.S. 856, 91 S.Ct. 24, 27 L.Ed.2d 95.

■ Thus the courts have designated some marks as strong and others as weak. A strong mark is one so arbitrary, fanciful or unique that it has come to symbolize the source of origin. *R. G. Barry Corp. v. A. Sandler Co.*, 406 F.2d 114 (1st Cir. 1969) and *Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968), *cert. denied*, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386.

■ On the other hand there are weak marks, or marks which describe the not so unusual or fanciful qualities of the product. *Barry, supra*. The strong marks are afforded the greater deference and protection while the latter is afforded little support, if any, all for the reasons previously stated.

■ This approach is not absolute, however, and the factor which caused the modification is again a recognition of fairness. If a weak mark of the generic or descriptive type has developed a secondary meaning so that despite its descriptive nature, the efforts of the user of the mark have resulted in the consuming public's finding the mark to identify the producer rather than the product as the primary significance of the mark, limited protection is available. *Kellogg, supra; Aloe Creme Laboratories, Inc., v. Milsan, Inc.*, 423 F.2d 845 (5th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90, *reh. denied*, 400 U.S. 856, and *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2nd Cir. 1970). In such a case, once secondary meaning has been established, the fact that there is a subordinate meaning is no longer controlling.

■ A further limitation on the protection afforded weak marks is that there must be shown, in addition to a secondary meaning, a likelihood of confusion. Thus within those areas in which a weak mark is shown to have secondary meaning, it is entitled to protection if there is proof of a likelihood of confusion. *J. B. Williams Co., Inc. v. Conte Cosmetics, Inc.*, 523 F.2d 187 (9th Cir. 1975) and *FS Services Inc. v. Farm Services*, 471 F.2d 671 (7th Cir. 1972). This additional requirement, a likelihood of confusion, is again a product of consideration of fairness, for if there is no likelihood that a consumer would confuse the products, there is little purpose to be served in protecting the first user against a harm which is not likely to develop.

In the instant case, the particular mark is "Jewel." As noted this word is a common one. In regular conversation, the word turns up frequently in phrases like "She's a real jewel." It is clearly a descriptive term when used in certain instances, a primary example being the usage of the defendant, Jewel Mart.

■ It is a weak mark therefore, and entitled to protection only upon a showing of secondary meaning. See generally 3 Callman, Unfair Competition, Trademarks and Monopolies § 82.1(1). Concededly, as used by plaintiff "Jewel" is not wholly descriptive. Such was the finding made by another District Judge who considered the mark at any earlier time in a different context. In *Jewel Tea Co. v. Kraus*, 88 F.Supp. 1003 (N.D.Ill.1950), *aff'd*, 187 F.2d 278 (7th Cir. 1951), the Court found that it was difficult to categorize this mark as solely descriptive in that it was also figurative or suggestive, requiring some imagination on the part of an observer, and had meaning beyond the connotation of excellence conveyed by the word. Confronted with this ambiguity, the Court relied upon the secondary meaning. Thus even if only partially descriptive, there is no doubt that the mark is a weak one and that secondary meaning must be established if protection is to be afforded.

■ The Court has found that there are numerous third party registrations of the word "Jewel" and that countless firms in the United States in general and Northeastern Ohio in particular use the word "jewel" in their names. Such evidence is relevant in the court's determination as to the existence of secondary meanings. *FS Services Inc. v. Custom Farm Services*, 471 F.2d 671 (7th Cir. 1972); *Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968); *Atlas Supply Co. v. Atlas Brake*, 360 F.2d 16 (6th Cir. 1966), and *Lectrotech Co. v. Electromark Corp.*, 149 F.Supp. 647 (N.D. Ohio 1957). With such evidence before the Court, the finding of a broad secondary meaning or association by the public of "Jewel" with plaintiff is not possible.

■ However, there is uncontradicted evidence that the word "jewel" when used in connection with an in-home shopping service does result in the identification by the public of that service with plaintiff. In other words, the secondary meaning shown by plaintiff to exist as to its mark, "Jewel," exists, but only as to an in-home shopping service.

Insofar as the final portion of the analysis is concerned, the confusion to which the 18 consumer witnesses testified is weak when viewed under the test set forth by the Court of Appeals for the Ninth Circuit in *J. B. Williams Co. Inc. v. LeConte Cosmetics, Inc.*, 523 F.2d 187 (9th Cir. 1975). In that case, the Court indicated that among important factors to be evaluated in assessing the likelihood of confusion are the strength or weakness of the mark, the similarity of appearance and meaning of the marks, the class of goods, the marketing channels and the evidence of intentional copying. In this case, the Court finds that the mark is a weak one, that the two marks are not similar in appearance, that the class of goods sold although related are in no way identical, that the marketing channels are very dissimilar and that there is no evidence at all of intentional copying.

The weakness of potential confusion becomes even more evident when the harm against which the unfair competition laws protect is recalled. The decree of confusion to which the witnesses testified is a risk which plaintiff took when in 1899, it took "Jewel" as its mark. *Atlas Supply Co. v. Atlas Brake Shops, Inc.*, 360 F.2d 16 (6th Cir. 1966) and *Westward Coach*, 388 F.2d 627 (7th Cir. 1968).

## IV. CONCLUSION

Putting the facts and law together, the Court finds that plaintiff has a weak mark, but one that has acquired a secondary meaning in relation to in-home shopping services.[4] As such it is entitled to protection, albeit limited protection. *Atlas Supply, supra*, and *W. E. Kautenberg Co. v. Ekco Products Co.*, 251 F.2d 628 (C.C.P.A. 1958). There is little evidence of a likelihood of confusion of a kind that the courts

---

4. Although plaintiff is composed of several divisions, there was little evidence introduced as to these other divisions. There was no evidence presented as to the existence of second-ary meaning or likelihood of confusion in regard to these other divisions and the Court will accordingly limit its conclusions to the Jewel Home Shopping Service.

have been willing to afford protection against, however, and the Court is therefore not persuaded that any relief is proper. As plaintiff chose a weak mark to extend the protection afforded by the trademark and unfair competition laws so far as to enjoin defendant's use of the word "Jewel" would be wholly unwarranted. Equally inappropriate is an award of damages. This is not to suggest that a different result would not obtain were defendant to develop an in-home shopping service similar to plaintiff's system, however. The decision is limited to the facts as found.

IT IS SO ORDERED.