**WLWC CENTERS, INC., Plaintiff,**

v.

**WINNERS CORPORATION, Defendant.**

**Nos. 3–83–0166, 3–83–0169.**

United States District Court,
M.D. Tennessee,
Nashville Division.

May 12, 1983.

718

Jay S. Bowen, Nashville, Tenn., for defendant.

John B. Link, III, James E. Kirby, Douglas E. Jones, Nashville, Tenn., for plaintiff.

## MEMORANDUM

WISEMAN, District Judge.

The plaintiff, WLWC Centers, Inc. [WLWC], brought this action for a declaratory judgment as to each party's use of the term "Winners" and seeking removal of the trademark of defendant, Winners Corporation [Winners Corp.], from the Principal Register of the United States Patent Office. Three days after the filing of WLWC's suit, Winners Corp. filed a suit alleging trademark infringement by WLWC[1] and asking the Court to grant a

---

1. The suit by Winners Corp. further alleges that the conduct of WLWC constitutes unfair competition, infringement of common law rights and false description. In *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 514 F.Supp. 704, 709 (S.D.Ohio E.D.), af-

preliminary injunction. At a hearing on March 10, 1983, the Court consolidated the two cases and heard oral arguments with respect to the request by Winners Corp. for a preliminary injunction. The Court refused to issue a preliminary injunction at that time and took the matter under advisement.

### Background

Winners Corp. is a Tennessee corporation having its principal place of business in Brentwood, Tennessee. On September 22, 1981, Volunteer Capitol Corporation [Volunteer] registered "Mrs. Winner's" as a service mark in fancy block and script letters on the Principal Register. On October 6, 1981, Volunteer registered the term "Mrs. Winner's" in block letters as its trademark. On October 20, 1981, Volunteer registered the term in block letters as a service mark and on December 22, 1981, the term was registered in fancy block and script letters as a trademark. On May 6, 1982, Volunteer changed its name to Winners Corporation. The term "Mrs. Winner's" has been in use since 1979 in connection with the sale of specific food products of Winners Corp. and its predecessor in name, Volunteer.

WLWC is a Tennessee corporation chartered on October 20, 1982, with its principal place of business in Nashville, Tennessee. WLWC submitted the service mark "Winners Weight Loss Centers" to the State Department of the State of Tennessee in late December, 1982. On December 28, 1982, the Secretary of State of the State of Tennessee authorized the exclusive use by WLWC of the term "Winners Weight Loss Centers" for use in connection with "weight loss centers and private brand labeled foods." WLWC immediately began an advertising campaign using "Winners Weight Loss Centers" as its trademark.

### Validity of the Trademark

█ In an action for infringement of a registered trademark, the threshold ques-

tion is whether the word or symbol is registerable or protectable. Any analysis of the validity of a trademark focuses upon four categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See* 2 J. McCarthy, Trademarks and Unfair Competition, § 23:1A [McCarthy]. A generic term is the name of a particular genus or class of which an individual article or service is a member. A generic term is incapable of trademark protection. *See Vision Center v. Optiks, Inc.,* 596 F.2d 111, 115 (5th Cir.1979). A descriptive term is valid and registerable upon a showing of "secondary meaning," that is, a showing that the public identifies the trademark with a particular "source" rather than the product. *See* 1 McCarthy, § 11.5. However, before a court can require a showing of secondary meaning for registration of a mark, the mark must be found to be "merely descriptive or deceptively misdescriptive." 15 U.S.C. § 1052. "A mark is descriptive if it is descriptive of: the intended purpose, function or use of the goods; of the size of the goods, of the class of users of the goods, of a desirable characteristic of the goods, or the end effect on the user." 1 McCarthy, § 11:5. A suggestive term does not require a finding of secondary meaning to be registered. Rather than describing an ingredient or characteristic of a product, a suggestive term requires the consumer to use imagination or perception to determine the nature of the goods. *See Abercrombie & Fitch Company v. Hunting World, Inc.,* 537 F.2d 4, 10 (2d Cir.1976). Finally, arbitrary or fanciful marks bear no relationship to the product or services. They are valid without any further showing. 1 McCarthy, § 11:2.

Neither party to this action alleges that "Mrs. Winner's" is a generic term. Nor does the Court have difficulty ruling that the mark is not arbitrary or fanciful. Winners Corp. itself defines an arbitrary or fanciful mark as "one that is 'coined' and has no meaning other than identifying a

---

firmed in part and reversed and remanded in part, 670 F.2d 642 (6th Cir.1982), the court acknowledged that the required showing for the above-listed claims is "closely analogous, if

not identical with . . . . " the standard applied in federal trademark infringement actions. Thus, the Court will examine all claims under the "likelihood of confusion" test.

particular product or source thereof." *See* Defendant's Memorandum of Law in Support of Application for Preliminary Injunction, p. 11. In view of the common usage and understanding of the term "winners" and attempts by Winners Corp. to closely associate itself with the term through its advertising campaign,[2] the Court cannot say the mark "Mrs. Winner's" has no meaning other than identifying a particular product or source thereof.

■ The critical decision is whether the mark is merely descriptive or suggestive. Courts have long noted that the distinction between merely descriptive and suggestive marks is "nebulous" and "there is a thin line between a suggestive and a merely descriptive designation...." *In re Gourmet Bakers,* 173 U.S.P.Q. 565 (TMT App.Bd. 1972) ("the long one" for bread held suggestive); *In re Morton-Norwich Products,* 209 U.S.P.Q. 791 (TMT App.Bd.1981) ("color care" for laundry bleach held suggestive). Courts now hold that registration of a trademark by the Patent and Trademark Office, without requiring proof of secondary meaning, establishes a rebuttable presumption that the mark is suggestive rather than merely descriptive. *See, e.g., Proctor and Gamble v. Johnson and Johnson,* 205 U.S.P.Q. 697, 707 (S.D.N.Y.1979) ("sure" for deodorant held suggestive); *Abercrombie and Fitch,* 537 F.2d at 11.

■ The mark "Mrs. Winner's" does not convey an immediate idea of the ingredients, qualities or characteristics of their goods. Rather, the term, with slight help from thought and imagination of consumers, conjures up the belief that this is a good or winning product. While attempting to define suggestive terms and evaluating the mark "jewel," one court noted:

> Such terms, indeed, shed some light upon the characteristics of the goods, but so applied they involve an element of incongruity, and in order to be understood as descriptive, they must be taken in a suggestive or figurative sense through an effort of the imagination on the part of

the observer. Such words do not stand primarily descriptive of kind or quality except in a figurative way for excellence or quality or grade or class and may be marks of origin and not of quality. The court is of the opinion that insofar as the word jewel is concerned, however, no clear line of demarkation can be drawn between a descriptive or suggestive category, and it would appear in such a situation that proof, if any, of secondary meaning would more accurately evaluate the plaintiff's rights.

*Jewel Tea Company v. Kraus,* 88 F.Supp. 1003, 1006 (N.D.Ill.E.D.1950), *aff'd,* 187 F.2d 278 (7th Cir.1951). Given the presumption favoring suggestive categorization and the nebulous distinction between suggestive and merely descriptive marks, the Court cannot hold that "Mrs. Winner's" is merely descriptive. The Court is in agreement with the *Jewel* court, that a more proper method of limiting a mark is through affording it only limited protection if it is a "weak" mark.

WLWC also contends that "Mrs. Winner's" should be removed from the Principal Register because it is "primarily merely a surname." *See* 15 U.S.C. § 1052(e)(3). Courts have applied either of two tests in determining whether a mark is primarily merely a surname. Some decisions prohibit registration if the principal or ordinary significance of a word is that of a surname. As one court noted:

> ... if the word has ordinary meanings as a word and its use as a surname is relatively unimportant, it may be registered without regard to the fact that it might have been used as a surname.

*Ex parte Wayne Pump Co.,* 88 U.S.P.Q. 437 (Comm.Pat.1951). Other courts hold that a mark is primarily merely a surname only if the *only* impact on customers is the impression that the mark is a surname. *See* 1 McCarthy, § 13:11. In other words:

> If the mark has well known meanings as a word in the language and the purchas-

**2.** A more detailed analysis of the Winners Corp. advertising campaign is included in the section of this memorandum entitled "I. Strength of the Mark," *infra.*

ing public, upon seeing it on the goods, may not attribute surname significance to it, it is not primarily merely a surname. "King," "Cotton" and "Boatman" fall in this category.

*Ex parte Rivera Watch Corp.,* 106 U.S.P.Q. 145 (Comm.Pat.1955).

Under either test, "Mrs. Winner's" is not primarily merely a surname. The word "winners" has a definite meaning as a word other than as a surname. Although the addition of the courtesy prefix "Mrs." may serve to enhance the surname significance of a name, similar marks have been held not to be primarily merely a surname. *See* 1 McCarthy § 13:11. Winners Corp. asserts the name is "fanciful" and there has been no assertion that "Mrs. Winner's" is the name of an individual involved with Winners Corp. In view of the common usage of the word "winners" and the efforts by Winners Corp. to take advantage of that usage, the Court cannot find that "Mrs. Winner's" is primarily merely a surname. Thus, the mark shall remain listed on the Principal Register.

### *Likelihood of Confusion*

The second inquiry in this action is whether Winners Corp. may prohibit use of the term "Winners" in any other mark. Two facts must be noted at the outset. First, WLWC has not attempted to use the entire mark "Mrs. Winner's" as part of their own mark. Rather, they use only the common word "Winners" coupled with the additional words "Weight Loss Centers." Second, the Court is now concerned with the amount of protection which shall be afforded the Winners Corp. mark, not the validity of the mark. The fundamental inquiry in a trademark infringement action is whether there is a "likelihood of confusion" between the marks in question. The Lanham Act expressly proscribes conduct by any person who shall, without the consent of the registrant, "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with which such use is likely to cause confusion or to cause mistake, or to deceive . . . ."

15 U.S.C. § 1114(1)(a). The Sixth Circuit most recently reaffirmed the likelihood of confusion test in *Hindu Incense v. Meadows,* 692 F.2d 1048 (6th Cir.1982). The confusion may be either a confusion as to the goods or services themselves or confusion as to their source. *See, e.g., Beer Nuts, Inc. v. King Nut Company,* 477 F.2d 326 (6th Cir.), *cert. denied* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108, *reh. denied,* 414 U.S. 1033, 94 S.Ct. 465, 38 L.Ed.2d 326 (1973).

Numerous courts have addressed the question as to what is necessary to create a likelihood of confusion. Although the specific tests vary to some extent, the courts generally rely upon a fairly consistent set of factors. In *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.1982), the Sixth Circuit adopted eight factors by which to determine whether there exists a likelihood of confusion: (1) strength of the first user's mark, (2) relatedness of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) second user's intent in selecting the mark and (8) likelihood of expansion of the product lines. Within this framework, however, courts have long recognized that each case of trademark infringement must be evaluated on its peculiar facts and circumstances. *See, e.g., Scott Paper Company v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3rd Cir. 1978).

### I. *Strength of the Mark*

Courts have developed categories of strong and weak trademarks as a means of balancing competing interests and unfair competition in trademark infringement cases. There is a strong desire to protect the first user of the mark because he or she went through the necessary effort to establish the mark as a meaningful symbol. Conversely, courts are reluctant to allow a company to monopolize the rights to a common word. *See, e.g., Jewel Companies, Inc. v. The Westhall Company,* 413 F.Supp. 994, 1000 (N.D.Ohio E.D.1976).

The strength of a trademark depends upon "the distinctiveness of the mark, or

more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). A strong mark is one so arbitrary, fanciful or unique that it has come to symbolize the source of origin. *See R.G. Barry Corp. v. A. Sandler Company,* 406 F.2d 114 (1st Cir. 1969). Weak marks are those that describe the not so usual or fanciful qualities of the product. *Id.* Strong marks are given a great deal of protection over both a wide range of related products and variations on appearance of the mark. Courts give a narrow range of protection to weak marks, both as to products and visual variations. *See generally* 1 McCarthy, § 11:24. These two categories are not meant to be inflexible and totally distinct. They are merely a means of analysis motivated by the aforementioned notion of fairness. As one court noted: "The description of marks as weak or strong and references to the breadth of protection to be given a mark, have served as a convenient type of shorthand in the literature of opinions concerned with likelihood of confusion." *King Candy Company v. Eunice King's Kitchen,* 496 F.2d 1400 (Cust. & Pat.App.1974).

The issue *sub judice* is whether the use of the word "Winners" by WLWC in its mark "Winners Weight Loss Centers" is an unlawful infringement of the trademark "Mrs. Winner's" registered by Winners Corp.

The Court finds "Mrs. Winner's" to be a weak mark. The word "winners" is in common use. Generally, it means a favorable outcome, success or a sign of excellence. The definition in *Webster's New World Dictionary,* 2d Ed. (1977), at 862 is: "One that wins; one that seems destined to win or be successful." In determining the likelihood of confusion, the dictionary definition of a word is an appropriate and relevant indication of the ordinary significance in meanings of words to the public. *See American Heritage Life Insurance v. Heritage Life Insurance,* 494 F.2d 3 (5th Cir.1974). The extent to which Winners Corp. attempts to take advantage of the common usage of the word is evident from its own advertising.

*See* Exhibit 2 of Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion for Preliminary Injunction. Under a picture of a "Mrs. Winner's Chicken and Biscuits" restaurant appears the sentence, in bold print: "Nashville, You're a Town for Winners!" ("Winners" is capitalized, but without any apostrophe.) Next appears the sentence, in smaller type: "We know, because you've made us a winner here, too." Thus, an unquestionable connection is drawn between the mark "Mrs. Winner's" and the common understanding of the word "winners."

The numerous trademark registrations involving the term "winners" are additional evidence of the common nature of the term. *See* Exhibit 1 attached to Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion for Preliminary Injunction. Several of the marks are registered exclusively for food products and several of the marks belong to Middle Tennessee companies. Winners Corp. correctly points out that mere registration does not prove the marks were ever put to actual use, and the Court "will not assume any knowledge on the part of the person public of mere registrations in the patent office. . . ." *See J.C. Hall Company v. Hallmark Cards, Inc.,* 340 F.2d 960 (Cust. & Pat.App.1965). However, other registrations of a mark do shed some minimal light on the degree of originality inherent in the "Winners" mark. *See, e.g., Proctor and Gamble v. Johnson and Johnson,* 205 U.S. P.Q. 697, 707 (SDNY 1979); *Clinton Detergent v. Proctor and Gamble,* 302 F.2d 745, 747 (Cust. & Pat.App.1962), ("Such third party registrations are evidence which we consider with other pertinent evidence on the issue of alleged distinctiveness of the mark.").

The foregoing analysis leads the Court to conclude that the mark "Mrs. Winner's" is a very weak mark warranting little protection. Earlier, in determining the validity of the mark, the Court found the mark to be suggestive and not merely descriptive. Winners Corp. apparently believes that this classification means no further showing of

secondary meaning is necessary and they have exclusive right to the term "Winners." The Court must disagree. In *Proctor and Gamble v. Johnson and Johnson,* 205 U.S. P.Q. 697, 707 (S.D.N.Y.1979), after classifying the mark "Sure" as suggestive, the court went on to hold that the "Sure" deodorant mark "is intrinsically very weak, falling in the weakest end of the range. It is not very distinctive; its identifying or 'origin-indicating' capacities are very low." The Court compared "Sure" to other laudatory marks like best, outstanding or supreme which are entitled to little or no protection. *See, e.g., Supreme Wine v. American Distilling,* 310 F.2d 888 (2d Cir. 1962); *Exquisite Form Industries v. Exquisite Fabrics of London,* 378 F.Supp. 403 (S.D.N.Y.1974). Similarly, in *Jewel,* after noting that the mark was only partially descriptive and ultimately categorizing it as suggestive, the court noted: ". . . there is no doubt that the mark is a weak one and that secondary meaning must be established if protection is to be afforded." *Jewel,* 413 F.Supp. at 1001. Thus, as a weak mark, "Mrs. Winner's" is entitled to significant protection only if it can establish secondary meaning.

■ To establish secondary meaning a party must demonstrate that the primary significance of the term in the mind of the consuming public is not the product but the producer. *See Kellogg Company v. National Biscuit Company,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, 78 (1938); *Carter-Wallace, Inc. v. Proctor and Gamble,* 434 F.2d 794, 802 (9th Cir.1970) (Does the mark denote "a single thing coming from a single source?"). Generally, parties attempt to demonstrate secondary meaning through various factors including long-term usage, considerable effort and expenditure toward developing a reputation and good will for the trademark, resulting in a conscious connection in the minds of the general public of that trademark to the producer's product. *See, e.g., General Motors Corp. v. Cadillac Marine and Boat Company,* 226 F.Supp. 716 (W.D.Mich.S.D.1964); *Mother's Restaurants v. Mother's Bakery,* 498 F.Supp. 847 (W.D.N.Y.1980). Winners

Corp. faces two obstacles in establishing secondary meaning. First, Winners Corp. bears the burden of proof on the issue of secondary meaning. *See Kellogg, supra.* Second, the more common the term, the more difficult it becomes to establish secondary meaning. *See, e.g., Proctor and Gamble v. Johnson and Johnson,* 205 U.S. P.Q. 697, 708 (S.D.N.Y.1979); *American Heritage Life Insurance v. Heritage Life Insurance,* 494 F.2d 3, 12 (5th Cir.1974).

Winners Corp. offers very little proof of secondary meaning. The trademark had only been in use for approximately three years when WLWC began operations. Winners Corp. has failed to present any cases in which secondary meaning was established in such a short period. The only evidence of advertising and good will stem from the affidavit of M.V. Hussung, President of Winners Corp. He states: "Winners Corporation has spent a great deal of money and time developing an identity for its corporate name and registered trademarks including substantial outlays of advertising services in order to inculcate the public that 'Mrs. Winner's' is synonymous with quality products and services." He further notes that Winners Corp. was selected as a top restaurant service nationwide.

Any such bare assertions are unpersuasive. Likewise, popularity in sales alone cannot establish secondary meaning. *See Ralston Purina Company v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y. 1972). The *Ralston Purina* court also took note of the highly competitive market in which the plaintiffs "Tender Vittles" semimoist cat food was marketed and where the public "was assaulted with a number of new products within a relatively short period of time. . . ." *Id.* at 134. Winners Corp. has been involved in a similar struggle. In the Nashville area, Winners Corp. must compete with Kentucky Fried Chicken, Church's Fried Chicken, Lee's Famous Recipe Fried Chicken, and Bojangle's. Lee's and Bojangle's did not enter the Nashville market until 1982. Thus, a simple statement that Winners Corp. has spent a great

deal of money on advertising is inconclusive as to the establishment of secondary meaning because such expenditures appear necessary merely to survive.

Finally, Winners Corp. asserts that the customer inquiries recorded by Winners Corp. employees prove the term "winners" has secondary meaning with reference to "Mrs. Winner's." *See* Hussung and Stout affidavits. The Court disagrees. Many, if not most, of the inquiries were from persons who appear to be friends or relatives of Winners Corp. employees. As such, they have special knowledge of the mark "Mrs. Winner's" that does not stem from general advertising or promotion by Winners Corp. The obvious possibility for bias or at least knowledge not available to the general public renders these inquiries of little value. Thus, Winners Corp. has failed to sustain the burden of proof necessary to establish secondary meaning.

II. *Relatedness of the Goods*

Both Winners Corp. and WLWC are involved in the sale of food products. However, in a larger sense the product of WLWC is the antithesis of the product of Winners Corp. Winners Corp. is engaged in the "fast food" business. It sells a relatively limited selection of foods (most notably chicken and biscuits) which may be consumed either on or off the premises. All meals are fully prepared prior to sale to the customer. Conversely, WLWC sells a diet program and as a separate sale offers the food necessary to carry out that program. The two products of WLWC are inextricably connected because a customer cannot buy the food without having first purchased the entire diet program.

Even ignoring the "diet program" aspects of the WLWC product, there are significant differences in the food products offered by the two companies. All food sold by WLWC, except for some snack foods, is to be consumed off the premises, requiring further preparation by the consumer. WLWC offers a variety of nutritionally balanced meals ranging from omelets and soup to lasagna and veal cordon bleu. All of the foods sold by WLWC are packaged in quantity with a designated calorie count for application to the total diet program.

Simply because both companies sell food products, does not necessarily suggest a likelihood of confusion. Courts have long recognized the ability of consumers to distinguish between various food products. In *General Motors Corp. v. Cadillac Marine & Boat Co.,* 226 F.Supp. 716 (W.D.Mich.S.D. 1964), the court quoted with approval a Seventh Circuit opinion in which the court stated:

> Unless "Sunkist" covers everything edible under the sun, we cannot believe that anyone whose I.Q. is high enough to be regarded by the law would ever be confused or would be likely to be confused in the purchase of a loaf of bread branded as "Sunkist" because someone else sold fruits and vegetables under that name. The purchaser is buying bread, not a name. If the plaintiff sold bread under the name "Sunkist," that would present a different question; but the plaintiffs do not, and there is no finding that the plaintiffs ever applied the word "Sunkist" to bakery products.

*California Fruit Growers Exchange v. Sunkist Baking Company,* 166 F.2d 971, 973–74 (7th Cir.1947). *See also King Candy Company v. Eunice Kings Kitchen, Inc.,* 496 F.2d 1400 (Cust. & Pat.App.1974) (The court found no likelihood of confusion between trademarks for two food products, candy and cakes.); *Amstar v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir.1980) (The court found no likelihood of confusion between two food products, pizza and sugar.). Similarly, other courts have been able to distinguish goods falling in the same general category. *See, e.g., S.C. Johnson and Son, Inc. v. Johnson,* 266 F.2d 129 (6th Cir.1959) (The court distinguished brooms and mops.); *Scott Paper Company v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978) (The court distinguished paper goods and household cleaners.). The products of Winners Corp. and WLWC are not so related as to cause a likelihood of confusion for consumers.

### III. Similarity of the Marks

Both marks prominently display the word "Winners." However, similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features. *See* Restatement of Torts § 729, Comment B (1938). The Winners Corp. mark is always displayed in the possessive and with the words "chicken and biscuits." *See* Exhibit C to Affidavit of Bob Fields. On the other hand, WLWC displays the word "Winners" inside a banner underneath which appear the words "Weight Loss Centers." *See* Exhibit B to Affidavit of Bob Fields. Although the word "Winners" is the most prominent term in both marks, the overall impression of the two marks is very different. It is this "overall impression" that is critical. *See Armstrong Corp. Company v. World Carpets, Inc.,* 597 F.2d 496, 502 (5th Cir.1979).

### IV. Evidence of Actual Confusion

While evidence of actual confusion is not necessary to establish a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion. *See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville,* 670 F.2d 642 (6th Cir.1982). In the instant case, the only evidence of actual confusion was the consumer inquiries recorded by Winners Corp. personnel. As previously noted, the Court gives little weight to this evidence. The consumer inquiries resemble the testimony of 18 consumer witnesses in *Jewel Companies, Inc. v. The Westhall Company,* 413 F.Supp. 994 (N.D.Ohio E.D.1976). In *Jewel,* the court discounted the consumer statements noting:

> Their statements indicated that they "thought" that there "might" be a relationship between the two, they "assumed" that there was a relationship, or as another witness indicated, upon thinking about what company Jewel Mart was connected with, she thought of Jewel Tea because of the similarity of names and the process of association. This is a very weak degree of confusion. The strongest confusion would have been that which resulted in a customer going to Jewel Mart and making a purchase *because* the customer thought the store was operated by Jewel Tea.

*Id.,* at 999. Other courts have discounted evidence of actual confusion developed through opinion polls because the persons interviewed did not adequately represent a fair sampling of the consuming public. *See, e.g., Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir.1980). The consumer inquiries reported by Winners Corp. cannot be found to emanate from a random sampling or from the public at large.

### V. Marketing Channels Used

Winners Corp. admits that the goods of the two parties are not marketed through the same channel. *See* Defendant's Supplemental Memorandum in Support of Application for Preliminary Injunction, p. 8. Both companies sell their products from individual retail outlets, and both engage in extensive advertising. However, there are great differences between both the retail outlets and the advertising. Winners Corp. relies solely on its "walk-in" business, i.e., it has no contact with individual customers prior to their entering the restaurant. Conversely, WLWC estimates that five percent or less of its customers are walk-ins. The initial contact between WLWC and its prospective customer is usually by telephone. After the initial telephone contact, the customer is invited to one of the WLWC retail outlets for a more in depth explanation of the entire diet program. *See* Affidavit of Mark Harrah, p. 1. The newspaper advertisements of WLWC further distinguish its product. *See* Exhibits G and H to Affidavit of M.V. Hussung, Jr. The advertisements stress a complete weight loss program and great tasting frozen food. Thus, the Court can find no likelihood of confusion created by the marketing channels used by the two companies.

### VI. Likely Degree of Purchaser Care

The Sixth Circuit has previously addressed the casual degree of purchaser care in selecting fast food restaurants. The *Frisch's* court noted: "The 'fast food' products promoted by Elby's are not likely to be

the object of intensive consumer research, but rather subject to 'impulse' buying...." *Frisch's*, 670 F.2d at 648. The products of WLWC involve a much higher degree of purchaser care. As noted above, a consumer does not simply walk-in to a WLWC center and purchase food. There is an initial phone conversation followed by a meeting at the weight loss center. At the initial meeting, the customer is familiarized with the entire diet program, a medical history is taken, and standard documentation is reviewed and completed with the customer. *See* Harrah Affidavit and Index of Records.

The lowest price of a Winners Weight Loss Program is $99. The cost of the entire diet program is significant in determining consumer care because, as previously noted, a consumer must purchase the diet program before she may begin to purchase any of the individual food items sold by WLWC. As noted by the Fifth Circuit, "a person buying a 'big ticket' item ... would ordinarily be expected to be a more careful buyer than the impulse purchaser or the purchaser of a relatively inexpensive item." *Armstrong Cork Company v. World Carpets, Inc.*, 597 F.2d 496, 504 (5th Cir.1979). Purchase of the diet program allows the customer to consult with WLWC registered dietitians and registered nurses and the customer may participate in behavior education meetings. The program continues for one year from the date of purchase. This exercise of consumer care further reduces the risk of confusion between the products of WLWC and Winners Corp.

## VII. *Second User's Intent in Selecting the Mark*

Winners Corp. asserts that the use of "r" within a circle next to the trademark "Winners Weight Loss Centers" is evidence of the bad faith of WLWC. It is clearly improper to use an "r" in a circle for a state registration. *See Du-Dad Company v. Creme Lure Company*, 143 U.S.P.Q. 358 (1964). The Court cannot condone this error by WLWC. However, the erroneous use of an "r" in a circle does not necessarily indicate any intent on the part of WLWC to copy the trademark of Winners Corp.

WLWC has admitted its error and has removed the circled "r" from its more recent advertisements. So long as WLWC does not continue to use the circled "r," the Court will not infer any bad faith in adopting the WLWC mark. There is absolutely no other evidence to suggest that WLWC attempted to derive any benefit from the reputation of Winners Corp. through its selection of a trademark.

## VIII. *Likelihood of Expansion of the Product Lines*

Winners Corp. informs the Court of the possibility that it will expand into the area of selling prepackaged foods. *See* Hussung Affidavit, p. 4. It is logical to assume that these prepackaged foods will be marketed through grocery stores. Although there is no evidence in the record that WLWC intends to sell its prepackaged foods through grocery stores, such expansion is not unforeseeable. However, given the entire nature of the WLWC weight loss program, the basic difference in the food products and the concentrated focus on the calorie content of its foods by WLWC, the Court does not find a likelihood of confusion caused by the expansion into new marketing channels.

## *Requirements for Injunctive Relief*

The familiar factors for issuance of a preliminary injunction were identified by the Sixth Circuit in *Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir.1977):

(a) whether the plaintiff has shown a strong or substantial likelihood of success on the merits.

(b) whether the plaintiff has shown irreparable injury.

(c) whether the issuance of a preliminary injunction would cause substantial harm to others.

(d) whether the public interest would be served by issuing a preliminary injunction.

The Court has completed an extensive analysis of the eight factors relevant to a finding of likelihood of confusion in trademark infringement cases. It is the determi-

nation of the Court that there is no likelihood of confusion between the trademarks of Winners Corp. and WLWC. It necessarily follows from this conclusion that Winners Corp. has failed to show a strong or substantial likelihood of success on the merits. Thus, it is unnecessary for the Court to examine the remaining three factors for the issuance of a preliminary injunction. The motion by Winners Corp. for issuance of a preliminary injunction shall be denied.